AYLMER L. FIANDER'S (dependents') CASE.

Suffolk.    December 3, 1935. — January 3, 1936.

Present: RUGG, C.J., CROSBY, PIERCE, DONAHUE, & QUA, JJ.

*Evidence*, Competency. *Workmen's Compensation Act*, Jurisdiction of Superior Court, Recommittal to Industrial Accident Board.

A medical expert's testimony that he had been told certain facts not shown by the evidence, and his opinion based in part on such facts, should not have been admitted over exception at a hearing by the Industrial Accident Board in proceedings under the workmen's compensation act.

On certification of a decision by the Industrial Accident Board, the Superior Court has no jurisdiction to strike from the record improper testimony admitted by the board over exception; its only power is to recommit the case for further hearing.

CERTIFICATION to the Superior Court under the provisions of the workmen's compensation act of a decision by the Industrial Accident Board awarding compensation.

The decrees appealed from were entered by order of *Macleod*, J.

*E. Field*, (*R. H. Field* with him,) for the insurer.

*R. E. Johnston*, for the claimants.

PIERCE, J. This is a workmen's compensation case. It comes to this court on the insurer's appeal from a final decree ordering payment of compensation. The insurer has also appealed from interlocutory decrees denying its motion to strike out incompetent evidence, received by the Industrial Accident Board over its exceptions, and to recommit the case to the board for the correction of errors in the admission of evidence.

The case originally came before the Industrial Accident Board on a claim filed on August 2, 1934, by the widow of the employee. In substance, the claim sets forth that the employee at about 1:15 A.M. on July 7, 1934, sustained injuries resulting in death, the injuries being described as "Electrocution and/or heat exhaustion." It is agreed that he was employed as a pressman for the assured and was working in connection with the making of battery boxes; that his death occurred while in the course of his employment; and that the widow and two children are dependents within the meaning of the act.

Upon all the evidence and the reasonable inferences to be drawn therefrom the single member found that "the conclusion is irresistible that the employee met his death from electrocution [which] . . . arose out of and in the course of his employment." On claim for review the reviewing board, after hearing, revised the decision of the single member so as to read that the deceased was employed on a hydraulic press which was operated by "hydraulic pressure," instead of that it was operated by "electricity," and as so revised affirmed and adopted the findings and decision of the single member. The insurer contends that there was no competent evidence to support the board's finding that the employee was electrocuted.

Among the witnesses heard was Dr. Timothy Leary, a pathologist and medical examiner for Suffolk County, who was employed by the insurer to perform an autopsy and make a report of his findings to the insurer, and was called as a witness by the single member.

The undisputed facts are as follows: The employee when injured was thirty-two years old. He was five feet seven inches tall, well developed and nourished; his heart was of normal size and the heart muscle was laxly fixed. The press was operated by moving a lever on the left hand side of the employee as he faced it. At his rear as he worked on the press was an electric heater to heat the material called a "biscuit" which was used for making the battery boxes. This heater was on a hinge, and rested on a metal table not fastened to the floor by anything except its own weight. This table was located about twenty-five or thirty inches from the press upon which the employee was working. The space was wide enough for a man to pass through. The employee's back was to the heater when operating the press, and he stood in the space of twenty-five or thirty inches when at work. The heater was supplied with heat by a voltage (ordinarily of one hundred twenty volts, taken from a single-phase transformer connected with the six hundred-volt mains outside the building) which is carried in conduit to the various heaters and presses. The material out of which the battery boxes are made is a compound with an asphalt base and in it is other fibrous material that is mixed at a temperature around four hundred degrees Fahrenheit. This is put in a die and the hydraulic pressure applied. It is necessary to keep the material warm, and in order to keep it warm it is put in an electric heater which sits close to the press. After the material has gone through the hydraulic power process it is placed in a carrier, which is above the press as high as an ordinary man can reach. This conveyor runs out to the inspection room; it is operated by electricity and is hung from wooden floor beams and girders. In a room adjacent to the press room, where the accident happened, there is a testing equipment which delivers three-phase

22,000 volt, test voltage to testing blocks for the battery boxes. The table on which the heater was placed is moved about very easily.

The employee collapsed while at work operating the above described hydraulic press. No electricity was used in the operation of the press, and there is no contention that the press was the source of any electric current which reached his body. An employee named Sellers was the only witness to the collapse. On the night of the accident while performing his task on one of the presses, Sellers noticed the employee leaning against the next press to his right. He was leaning forward with his head against the water pipes at the top of the press. Seeing that he was about to fall Sellers grasped him and lowered him to the floor. When Sellers saw the employee leaning against the next press no part of his body was in contact with the electric heater above described. Sellers testified that as he was lowering him to the floor he felt a tingling sensation — "a shock" — "It seemed like a tingling from head to foot"; that at this time he was not touching any machine and the employee's body was not touching anything but the floor; that he had never received a "shock" before when he was not touching two machines at the same time. Immediately after the employee collapsed one Smith, employed in the plant hospital, was sent for. He was a medical student in Tufts College in his fourth year. About seven to eight minutes after he received the call he went to the asphalt battery department and saw the employee lying on his back on the floor near the drinking fountain at the end of the room. Smith testified that he found no pulse; that the employee was then brought to the office and on examination there the witness could not find any pulse or heart beat; that he then tried artificial respiration using the prone method which he described as follows: He laid the man on the floor face down and laid his head on his arm. He then put his right knee between the man's legs. He then put both his hands on the man's back at approximately the eleventh rib, with his thumbs toward the center of the back. He continued the artificial respira-

tion for about one hour. During this time Dr. Loring arrived and he and Dr. Loring heard or felt a few regular heart beats, coming in groups of four and then nothing for a long time and then they would come again in groups of four. These heart beats stopped about fifteen minutes after Dr. Loring arrived, and the artificial respiration was discontinued on the advice of the medical examiner, Dr. Gallagher. Although they had full view of the employee's back, both Smith and Dr. Loring testified that they did not observe any marks on his back.

Dr. Timothy Leary was requested to perform an autopsy by the general manager of the insurer. He did so and made a written report to the insurer. He found that the employee's heart was normal, that externally there was a bruise or lesion situated over the left lower back and chest, a lesion that looked like a deep abrasion to the naked eye. Microscopic examination showed nothing abnormal and his findings were not enough to account for death organically. He obtained a history of the case from Dr. Gallagher, the medical examiner, who made an investigation at the moment after the death. Subject to the exception of the insurer he testified that Dr. Gallagher said that "the temperature was 120 at the machine where the man was working and several feet away it was 100 — five feet away; that the heat was very great and that it was a terrible hot night"; that the employee was working stripped to his waist and his clothing was bathed in perspiration; that the floor was wet where the employee had been working; that the man working closest to the employee reported that he was seen to lean against the press and that this man grabbed him and let him down to the floor; that this man said that he got a distinct electric shock as he handled him with his wet hands against the employee's wet skin, and then the employee dropped away from him.

Dr. Leary was questioned as to whether he would have been able to form an opinion in this case if he had no history, but solely from his examination, and replied "that in his experience they do get cases of death where they are unable to find a cause"; that the employee died "prac-

tically instantly and the source of death under these con-
ditions is quite limited, a man may die suddenly from a
coronary disease and he may die from electrocution that
suddenly and those are perhaps the most rapid forms of
death that are known." Continuing, he testified as follows:
Slow forms of death are associated with very different or-
ganic changes. The findings in this case are not adequate
to make a finding that a disease of the coronary arteries
produced death — "that death resulted from the disease
but there was a possibility of coronary spasm causing death
but with a death of that sort there are indications that there
have been previous spasms and that the circulation has not
been good." Instances where a man has died as the result
of a first coronary spasm are extremely rare; in his vast
experience and from a considerable study of literature he
knows of only two or three cases and none that he remem-
bers was due to a coronary spasm in a normal coronary
artery. Occasionally there have been cases where the cause
of death could not be determined but such deaths prac-
tically never occur in individuals of the employee's age;
usually a definite source of death is found in a man of his
particular age. The witness was left with the possibility
at first that the employee had a coronary spasm and against
this there was a lack of evidence in his body of any circu-
latory disturbance. He had this story of shock trans-
mitted to another employee, and when he examined the
employee's body his back showed a burn or a lesion of the
type of burn not specifically electric, it could have been
thermatic, and with all this he was compelled to believe the
employee had suffered an electrocution.

Dr. Leary was further asked whether without the history
he could have determined the cause of death in this case,
and he replied: "no, from the surrounding facts I did
arrive at it without a history"; that he had just given his
reasons for his opinion, which were his reasons even without
a history; that from his examination there were possibili-
ties that the employee did suffer an electric shock; that his
examination suggested at least the possibility of an electric

shock; and that apart from coronary spasm, of which he had no evidence within the body, electric shock was practically the only thing that he could consider as the cause of death.

Dr. Leary also testified that the mark which he found on the body was not such a mark as could have occurred by anything done after death; that the mark did not occur as the result of artificial respiration by the use of the hands, the fingers and thumbs; that this mark was on the left lower back of the chest at about the ninth or tenth rib; that the lesion on the back was not any specific electric burn, but it was a burn; that the lesion was near enough to the employee's spine so that he would not have to make much of a turn to make a contact with the heater. He was asked whether the employee would have to touch the heater and the press at the same time, and answered that he did not know whether every possibility of shock was exhausted. On this issue it is important to note that the history of the case given Dr. Leary by the medical examiner, Dr. Gallagher, contains the statement that the "floor was wet" where the employee was working, and that that fact, if true, would "favor grounding" and be a possible source of contact with an electric current. An examination of the record discloses no justification for the statement that the floor was wet where the employee was standing; nor does the record disclose that the temperature in the working space was one hundred twenty degrees or in excess of ninety to one hundred degrees, Fahrenheit. The degree of the temperature was important because Dr. Leary got a history of the floor being wet; as were the further statements in the history of the case that the employee's body was bathed in perspiration as was his clothing, that he was working near the heater, that the temperature stated would induce excessive perspiration and if perspiration was very great, it would "favor grounding." The history of the case was important, material and perhaps vital in the proof, which the claimant was bound to sustain, that the employee came in contact with a lethal electric current that escaped from

the heater standing near to and back of him as he worked at the press. The history of the case told by Dr. Gallagher should not have been received over the objection of the insurer. *Pigeon's Case,* 216 Mass. 51. *Beckles's Case,* 230 Mass. 272. *Minns's Case,* 286 Mass. 459. *Farren's Case,* 290 Mass. 452. The history of the case contained in the report of Dr. Leary to the insurer and his own expression of opinion as to the cause of the employee's death, while "open to the inspection of the department" (G. L. [Ter. Ed.] c. 152, § 20), were not, therefore, admissible in evidence, as argued, to corroborate the findings of fact therein contained, when the facts thus stated thereafter became issues of fact before a *quasi* judicial tribunal.

The motion to strike from the record the opinion of Dr. Leary and to strike out his written report on the ground that they were based on facts not established by evidence was improperly presented for action to the Superior Court, that court being without power to reform the record of the Industrial Accident Board. The motion to recommit based upon the same grounds as the motion to strike out should have been allowed. It follows that the case is to be recommitted to the Industrial Accident Board for further consideration upon facts and rulings of law not inconsistent with this opinion.

*Decrees reversed.*